United States Courts
Southern District of Texas
FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

JUN 2 2 2007

Michael N. Milby, Clerk

| | | |
|---|---|---|
| GAVIN GORYL AND RAUL LABARDINI, | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| | § | C.A. NO. H-07-2079 |
| VS. | § | |
| | § | **JURY REQUESTED** |
| TIDAL SOFTWARE, INC. AND | § | |
| FLINT J. BRENTON, | § | |
| | § | |
| DEFENDANTS. | § | |

**INDEX OF MATTERS BEING FILED**

1.      Civil Action Cover Sheet

2.      Notice of Removal

3.      All documents on file in state court:

     a.      Docket Sheet for 2007-31382

     b.      Plaintiffs' Original Petition

     c.      Receipt

     d.      Electronic Filing Receipt

     e.      Original Answer and General Denial of Defendant Tidal Software, Inc.

4.      Designation of Counsel

**2007-31382**

FILED: ___05/22/2007___          GENERAL ORDER OF THE COURT ___11TH___

GORYL, GAVIN _____
                    **PLAINTIFFS**

SCHWENKER, CARL FREDERICK _____
                              Attorney

**NATURE OF ACTION**

BREACH OF CONTRACT _____

VS.

TIDAL SOFTWARE INC _____
                    **DEFENDANTS**

_____
                    Attorney

SURETIES ON COST BOND:

_____

_____

_____

Jury Fee Paid By:
788374
SCHWENKER, CARL FREDE

_____

**SETTINGS**



STATE OF TEXAS
COUNTY OF HARRIS
I, Charles Bacarisse, District Clerk of Harris County, Texas, do hereby certify that the foregoing data is a true and correct copy of the original record, now in my lawful custody and possession as appears of record in my office as of 9-20-07
a) filed on ______
b) recorded under ______ in the Minutes of said Court
c) abstracted from the original record in my lawful possession, electronically stored in digital form and pertaining to the ______ in reference to cause number ______, or
d) abstracted from the original record in my lawful possession, electronically stored in digital form and pertaining to ______ from ______ to the present date
Witness my official hand and seal of office this JUN 19 2007
CHARLES BACARISSE, DISTRICT CLERK
Harris County, Texas
By ______ Deputy

Filed
07 May 22 P4:52
Charles Bacarisse
District Clerk
Harris District

CAUSE NO. 2007-31382

| | | |
|---|---|---|
| GAVIN GORYL and | § | IN THE DISTRICT COURT |
| RAUL LABARDINI | § | |
| | § | |
| Plaintiffs, | § | |
| | § | OF HARRIS COUNTY, TEXAS |
| v. | § | |
| | § | |
| TIDAL SOFTWARE, INC. and | § | 11 JUDICIAL DISTRICT |
| FLINT J. BRENTON, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' ORIGINAL PETITION

Plaintiffs Gavin Goryl and Raul Labardini respectfully allege as follows against Defendants Tidal Software, Inc. and Flint J. Brenton:

### Discovery

1.  Discovery shall be conducted under Level II of the discovery control plans.

### Parties

2.  Plaintiffs Raul Labardini ("Labardini") and Gavin Goryl ("Goryl") are former employees of Defendant Tidal Software, Inc. and resided in Harris County, Texas as of the accrual of the claims in this action. Plaintiffs damages in this action are in excess of $1,050,000.

3.  Defendant Tidal Software, Inc. ("Tidal") is a California corporation with offices at 1001 South Dairy Ashford, Suite 300, Houston, Harris County, Texas 77077 and 2100 Geng Road, Suite 210, Palo Alto, California 94303. According to records on file with the Texas Secretary of State, Tidal may be served with process through its registered agent, Dean Patton, at 5700 W. Plano, Suite 100, Plano, Texas 75093. Alternatively, Tidal may be served at its

California office address through Mr. Jon Bode, Tidal's chief financial officer, or Mr. Charlie Velasquez, Tidal's vice president and its California registered agent. According to records on file with the Texas Secretary of State, Tidal's corporate charter is not in good standing in Texas because Tidal failed to comply with state tax requirements.

4.      Defendant Flint J. Brenton ("Brenton") is president and chief executive officer of Tidal and may be served with process at his Harris County residence located at 2323 Baker Road, Houston, Texas 77094.

### Nature of the Claims

5.      This is an action for breach of contract, labor code and Payday Act violations, retaliation, wrongful discharge, fraud, and statutory fraud under TEX. BUS. & COM. CODE § 27.01, conversion, theft of services, tortuous interference with contracts and existing business relations, breach of fiduciary duties, breach of the duty of good faith and fair dealing, slander and defamation, conspiracy, intentional infliction of emotional distress, constructive trust, negligent misrepresentation and declaratory judgment under the laws of the states of Texas and California and TEX. CIV. PRAC. & REM. CODE § 38.001. All causes of action are based on the same operative facts and arose out of the same transaction or occurrence or series of transactions or occurrences.

6.      Plaintiffs seek monetary relief, injunctive relief, declaratory relief and specific performance for, *intra alia*, Defendants' conspiracy to defraud Plaintiffs of over $350,000 in promised wages and stock options and to wrongfully discharge Goryl through various artifices, schemes and unconscionable employment practices. Plaintiffs also seek a temporary restraining order and preliminary injunction prohibiting Tidal from selling its stock during the pendency of

this dispute and ordering specific performance of Defendants' obligations, including delivery the wages, stock and stock options promised to Plaintiffs.

### Jurisdiction and Venue

7.      Defendants are amenable to the personal jurisdiction of this Court and to service of process.  Defendants have engaged in business in the State of Texas, including the acts described herein, and maintain a regular residence and place of business in Texas.

8.      Defendants have had sufficient minimum contacts with the State of Texas so that requiring them to respond to this action would not violate due process.  Tidal employs approximately 80 employees at its Houston, Texas business office.  Brenton often works out of Tidal's Houston office and owns a residence and real property in Harris County, Texas.  Thus, Tidal and Brenton are subject to the personal jurisdiction of this Court and are amenable to service of process as allowed by law and under the Texas long-arm statute.  TEX. CIV. P.& REM. CODE §§ 17.041-.045, TEX.R.CIV.P 120a, FED. R. CIV. P. Rule 4(e).

9.      The amount in controversy in this action exceeds the minimum jurisdictional amount for this Court.

10.      Venue is proper in Harris County under TEX. CIV. PRAC. & REM. CODE §15.002 because a substantial part of the events giving rise to this action occurred in Harris County and because Tidal's principle place of business in Texas at the time the causes of action arose was in Harris County. *See also* TEX. CIV. PRAC. & REM. CODE § 15.017 (specifying mandatory venue in the county in which the plaintiff resided at the time the cause of action arose in a suit for libel or slander).

## Background

11.     Goryl and Labardini and are former Tidal employees.  Tidal refused to pay them over $350,000 in outstanding wages and refused to honor stock options promised to them. Moreover, when Goryl raised these irregularities within the Tidal organization and pursued the amounts owed and attempted to exercise his protected rights, Tidal executives defamed him and retaliated against him in numerous ways, including by firing him.

12.     Tidal Software is a venture-funded software company with offices in Houston, Texas and Palo Alto, California.  As a private company, Tidal's stock is illiquid and its value is speculative.

13.     Tidal asserts that it is "a leading provider of application scheduling and performance management software" and counts among its customers General Mills, Hewlett-Packard, ING Direct, Microsoft, and T-Mobile Software."  *See* http://www.tidalsoft.com/News%20and%20Events/Press%20Releases/Company_News_MMS_2 007_Final.asp.  Tidal's main software products are its "Tidal Enterprise Scheduler" and its "Horizon" software product line.

14.     Tidal's primary venture investors include J.P. Morgan Partners, LLC, a private equity firm with over $11 billion in capital under management; Novus Ventures, which manages over $150 million in assets and is located in Cupertino, California; VantagePoint Venture Partners, a leading venture capital firm with over $2.8 billion under management and headquartered in San Bruno, California; and Kleiner Perkins Caufield & Byers, a large venture capital firm located in Menlo Park, California.  On information and belief, representatives of each venture investor company sit on Tidal's board of directors and assist in the management of the

business affairs of Tidal.  On information and belief, these directors and the venture investors had

actual knowledge of, or were recklessly indifferent to, the improper actions engaged in by Tidal

and Brenton, as alleged herein.

15.     During 2004 and 2005, Tidal hired Labardini and Goryl to work in sales and

customer account support roles in Tidal's Houston office, which at that time operated out of

Brenton's residence at 2323 Baker Road.  (Though Tidal had upwards of twenty business

employees working out of this residence at any given time, Tidal did not have appropriate permits

or authorizations to operate a business in this residential area.)

16.     To induce Goryl and Labardini to enter into employment with Tidal, Tidal offered

and promised compensation and other benefits to them, including wages, health insurance, a 401K

plan and stock options to purchase 500 shares of Tidal common stock for $0.40 per share if they

would accept employment with Tidal.  In reliance upon these promises and representations, both

gentlemen accepted Tidal's employment offer and began and continued working for Tidal and

performing the tasks and duties requested of them.

17.     As a condition of employment, Tidal also required Goryl and Labardini (and,

on information and belief, all other Texas-based Tidal employees) to execute a standard-

form, employer-generated employment agreement (the "Employment Agreement").  Among

other things, the Employment Agreement stated that it, along with the subject matter

addressed therein, would be governed by the laws of state of California and further stated

that:

> *It is the policy of Tidal Software, Inc., to conduct its affairs in strict*
> *compliance with the letter and the spirit of the law and to adhere to the*
> *highest principles of business ethics.  Accordingly, all officers, employees*
> *and independent contractors must avoid activities which are in conflict, or*

> *give the appearance of being in conflict, with these principles. . .. Each*
> *officer, employee and independent contractor must take every necessary*
> *action to bring problem areas to the attention of higher management for*
> *review.*

Accordingly, Goryl and Labardini understood that Tidal and its management would be required to

abide by the "highest principals of business ethics" in their dealings with them and that they (along

with other Texas employees) were also entitled to the heightened benefits and protections of

California law in addition to the underlying protections of Texas law in connection with their

employment with Tidal.  In performing their work and duties at Tidal, Plaintiffs relied upon Tidal

to abide by all of these promises.

18.     While at Tidal, Goryl and Labardini both received promotions and favorable

performance reviews.  Labardini was promoted to the position of "Inside Sales Team Lead" and

Goryl was promoted to the position of "West Horizon Sales, " where both served as support to

Todd Hogan, Tidal's Regional Vice President – West and Regional Account Manager.  Both

received increased base salaries and were promised additional variable compensation—which in

essence amounted to a percentage on Tidal's sales and licensing revenues—as described in

individual "Compensation Plan Details" sheets issued to each of them by Tidal.  True and correct

copies of the "Compensation Plan Details" sheets issued to Labardini and Goryl by Tidal in

connection with these positions are attached as Exhibits A and B, respectively.[1]  Notably, Goryl's

Compensation Plan Details sheet reflected that he could earn significant additional compensation

above his base salary and that total compensation within the first few months in his new position

could reach or exceed $304,000.  Tidal did not provide any subsequently revised compensation

---

[1]  Exhibit A erroneously lists Labardini's job title as "Inside Sales Team Lead – East," though his last position at Tidal
was actually in the West region.

plan to Labardini prior to his final day with Tidal nor did it provided any revised compensation plan to Goryl until at least September 21, 2006.

19.     Consequently, under their compensation plans, Labardini was entitled to additional wages of 0.5% to 0.75% on all deals in Tidal's West region and Goryl was entitled additional wages of 5% to 12% of all Horizon product revenues on all deals in Tidal's West region. (Generally, Plaintiffs received this compensation on a deal whenever their Regional Account Manager, Todd Hogan received compensation on the deal and, in Goryl's case, if the deal included the Horizon software product line.)

20.     Under custom and practice at the time, employees usually received payment of their additional wages on a deal within a few weeks (i.e., a payroll cycle or two) of Tidal's receipt of a customer's acceptance and/or confirmation the deal.

21.     For example, Tidal entered into a multi-product deal with General Mills in late December 2005.  Tidal employees were paid their additional wages up front on this deal in the by the January 15, 2006 payroll run, even though General Mills' payments to Tidal were spread over a number of subsequent months.  Because the deal involved the Horizon product line, a sizable portion of the deal was allocated to the Horizon component and Kevin Harbuck (Goryl's Horizon counterpart for Tidal's East region) received additional wages based upon the percentages specified in his "Compensation Plan Details" sheet, even though he had no particular involvement in the deal leading up to its closing.

22.     In June 2006, Tidal closed a large multi-million dollar deal with Hewlett-Packard (the "H-P deal"), which at that time was the largest single deal in the company's history.   Tidal received full payment on the deal from Hewlett-Packard shortly after it closed.  Tidal executives

have stated to other Tidal personnel that the Horizon portion of the deal constituted a significant percentage of the overall H-P deal.  Because the H-P deal fell within Tidal's West region and contained Horizon software products, Labardini and Goryl were entitled to receive additional wages of $56,250 and at least $293,500, respectively, based upon the rates specified in their "Compensation Plan Details" sheets.

23.     At no time before the H-P deal closed did Tidal ever indicate to Goryl or Labardini that they would not be compensated on the H-P deal.  By working for Tidal and performing the tasks and duties requested of them, Goryl and Labardini met and fully performed all of their employment obligations necessary to entitle them to payment of additional wages on the H-P deal.  Nevertheless, Tidal breached its obligations to the Plaintiffs and has refused to pay Plaintiffs the wages that they were promised and are due and, as discussed below, has also refused to allow Plaintiffs to exercise any of the stock options rightfully due them and, in fact, has denied that Plaintiffs continue to have any stock options whatsoever.

<div align="center">

**COUNT I:**
**Breach of Contract for Failure to Pay Wages Owed**

</div>

24.     Plaintiffs reallege the above paragraphs.

25.     By virtue of Tidal's employment offer and Goryl and Labardini's acceptance of that offer and performance of their jobs, Tidal and Plaintiffs entered into a contract.  Plaintiffs fully performed their contractual obligations.  Tidal, however, has not performed its contractual obligations.  Specifically, Tidal has failed to pay Plaintiffs the above-referenced wages and compensation owed to them.

26.     All conditions precedent have been performed or have occurred as required under Rule 54 of the Texas Rules of Civil Procedure.

27.     The principal monetary balance due Labardini for his unpaid wages is no less than $56,250.  The principal monetary balance due Goryl for his unpaid wages is no less than $293,500.  (Additionally, Tidal has failed to pay Goryl an additional $1,080 that was due and payable no later than the date of Goryl's final Tidal paycheck on or about March 31, 2007.)

28.     Plaintiffs made written demand on Tidal to pay the amounts due and to honor the stock options, but Tidal has refused to comply.  The written demand was made more than thirty (30) days before the filing of this suit in compliance with TEX. CIV. PRAC. & REM. CODE § 38.002.

29.     Tidal's non-performance constitutes a breach of contract.  As a result of Tidal's breaches, Plaintiffs have incurred incidental and consequential damages, including lost profits, plus costs and expenses, including attorneys' fees, to recover the amounts due.

30.     As a result of Tidal's breaches, Plaintiffs retained counsel to recover for Tidal's breaches.  Therefore, Plaintiffs also seek reimbursement for their reasonable attorneys' fees under TEX. CIV. PRAC. & REM. CODE §§ 38.001, *et seq.*

### COUNT II:
### Bad Faith Violations of the Texas Payday Act and California Labor Code

31.     Plaintiffs reallege the foregoing paragraphs.

32.     Around the close of the H-P deal, Brenton (and other Tidal executives and board members) realized that Tidal would have to pay several Tidal employees in excess of a million dollars collectively in additional wages as a result of the H-P deal.  Brenton understood that those pay-outs would significantly effect Tidal's cash position.  Brenton also realized that Tidal had already met or exceeded its revenue and financial targets for its 2006 fiscal year (which was ending June 30th) and that the inclusion of the H-P deal in fiscal 2006 revenues would not be

desirable either from a company management perspective—it would raise performance benchmarks for subsequent periods and would disrupt Tidal's steady growth curve—or from a personal perspective—it would make future bonus and performance metrics much harder to obtain. As a result, Brenton and Tidal's management had a strong desire to recognize the H-P deal in the following fiscal year.

33.     In response, Brenton took steps to fraudulently create the impression that the H-P deal had closed in July rather than in June in order to manipulate the timing and reporting of the H-P deal in Tidal's financial reports, even though he was specifically aware that: (i) Hewlett-Packard had approved, accepted, signed and returned an executed copy of the agreement to Tidal on Thursday June 29, 2006; (ii) the bulk of the software covered by the H-P deal had been delivered to Hewlett-Packard earlier that year and was in use at Hewlett-Packard well prior to the signing of the agreement; and, (iii) he had personally congratulated the Tidal team and their regional vice president for getting the H-P deal closed during a Tidal managers' conference call in June 2006.

34.     Despite those facts, in an effort to deceive auditors and other internal and external financial professionals regarding the timing of the closing of the H-P deal, Brenton mis-dated his signature page on the H-P agreement to reflect a date of "July 1, 2006" (a Saturday) even though he actually signed the agreement on June 29th or 30th and had verbally confirmed and communicated Tidal's acceptance of the agreement to Hewlett-Packard prior to that date.

35.     In addition, without justification or cause (and in furtherance of and in an effort to conceal these financial manipulations), Brenton also decided that Tidal would not pay the millions of dollars in wages owed to its employees on the H-P deal but that Tidal would instead retain and

initially suggesting that the delay was due to time required for Tidal's financial personnel to calculate what the payments should be and (implying) that payment of the additional wages would be forthcoming. In late July or early August, though, Brenton indicated that the H-P deal has "gone to the board," that it was not in his hands anymore, and that Tidal was refusing to pay those wages. (As a result of increasing frustration with Tidal's lack of responsiveness and questionable ethical conduct on this matter as well as the availability of other employment opportunities, Labardini departed Tidal in early September 2006.)

39.     In actuality, during that period and into September, Brenton and other Tidal executives were drawing up new compensation plans for the Tidal employees, which they intended to apply retroactively back to July 1st in order to fraudulently and wrongfully justify denying payment of additional wages to employees on the H-P deal. Brenton specifically drew up new compensation plans with knowledge of the H-P deal and, using hindsight and knowledge of past events, specifically crafted each employee's new compensation plan so that it would not appear to encompass the H-P deal.

40.     Tidal eventually issued and delivered these new compensation plans to its employees somewhere around September 21, 2006 and attempted to retroactively apply their terms back to July 1st in an effort to illegally and wrongfully avoid payment of the wages already owed to Tidal's employees.

41.     Tidal's and Brenton's unethical actions were committed in bad faith, were in breach of Tidal's express policy in its employees' Employment Agreements and were a deliberate attempt to avoid payment of wages owed to its employees, including Goryl and Labardini.

42.     Tidal's failures to pay Goryl and Labardini the above-referenced wages owed are

express violations of numerous provisions of the Texas Payday Act (*e.g.*, Texas Labor Code §§ 61.011, 61.014 and 61.015, *et seq.*) and of the California Labor Code (*e.g.*, § 204, *et seq.*)

43.     Goryl and Labardini have been seriously harmed as a result of Tidal's failure to pay these wages.

44.     Moreover, Tidal and Brenton's scheme to revise and retroactively apply compensation plans in an illegal effort to deprive or divest Tidal employees (including Labardini and Goryl) of previously due wages was committed in bad faith and constitutes a misdemeanor under California Labor Code § 216 and a ***third degree felony*** and an express violation of § 61.019(b) of the Texas Labor Code (which states that an employer commits an offense if the employer "intends to avoid payment of wages owed to an employee, intends to continue to employ the employee, and fails after demand to pay those wages").

45.     Plaintiffs are entitle to recover from the Defendants the full amount of the unpaid wages, an additional penalty in the amount of these unpaid wages under the Texas Labor Code, and *treble* the amount of these unpaid wages under California Labor Code § 206(b), as well as their costs and reasonable attorneys' fees incurred.

46.     Because Defendants' actions were committed in bad faith, Plaintiff's are also entitled to exemplary and punitive damages and to recovery of their costs and expenses, including reasonable attorneys' fees, in pursuing this action    Plaintiffs are entitled to recover these damages from all other executives and affiliates of Tidal who acted in concert in with Defendants in committing these wrongful actions.

## COUNTS III – IV:
## Whistleblower, Retaliation and Wrongful Discharge

47.     Plaintiffs reallege the foregoing paragraphs.

48.     Though Labardini departed Tidal in early September 2006, Goryl remained at Tidal and continued to perform his job.

49.     In accordance with Tidal's policy as expressed in his Employment Agreement, Goryl attempted for months to bring to the attention of Tidal supervisors, human resources personnel, management and board members various circumstances indicating apparent irregularities relating to Tidal's nonpayment of promised wages, contractual breaches, circumvention of compensation obligations, manipulation of revenues in relation to the H-P deal and (as discussed below) Tidal's promises of unrestricted stock option to a number of employees and Tidal's subsequent refusal to honor such promises.  Goryl reported these issues to his superiors in an attempt to bring these issues to light internally so that Tidal might promptly investigate and fix them, but his efforts were to no avail.

50.     Though Goryl had received favorable performances reviews and had never been subject to any adverse employment actions during his previous time at Tidal, once he began raising these issues within Tidal, he became subject to retaliatory and increasingly hostile adverse employment actions from his superiors.  Nevertheless, Goryl continued to fully and properly perform his job.

51.     In response to Goryl's initial inquiry into the wages owed to him, Tidal reacted by issuing a new and much less favorable compensation plan containing unrealistic quotas and goals to Goryl sometime around September 21, 2006, which Tidal wrongfully attempted to apply retroactively as discussed above.

52.     Having exhausted his available internal avenues, on November 20, 2006, Goryl (through his attorney) sent a fax to Tidal and a few of its board members again informing them of

these irregularities and requesting payment of the wages that he (and Labardini) were owed. Almost immediately after receipt of the fax, Tidal's vice president Charlie Velasquez met with Goryl and stated that "we [Tidal] value you [Goryl] as an employee" and that "you [Goryl] bring a lot of good to the company." Nevertheless, just a few days later (once Tidal realized that Goryl was not going to simply forgo these unpaid wages), Tidal reversed course and verbally placed Goryl on "probation" and informed him that his job was in jeopardy.

53.      On information and belief, around this time Brenton made a number of disparaging and false remarks to other Tidal personnel concerning Goryl and his job performance and "ordered a code red" within Tidal with respect to Goryl, in which he instructed Tidal supervisors to place Goryl on probation, monitor Goryl in more detail than other employees and to initiate a process to work toward the termination of Goryl.

54.      As discussed below, a few days later in early December 2006, Goryl notified Tidal that he was exercising the unrestricted stock options that had been promised to him when he was hired and presented a check to Tidal for the full exercise price. However, Tidal wrongfully refused to acknowledge Goryl's exercise of these stock options. In accordance with Tidal's policy as expressed in his Employment Agreement, Goryl subsequently attempted to internally raise this matter concerning his unrestricted stock options on a number of occasions, to no avail.

55.      As a result of Tidal's hostility and its continued failure to pay the wages owed, Goryl (and Labardini) were forced to file wage claims with the Texas Workforce Commission to seek recovery of the wages due to them (the "Wage Claims"). These Wage Claims were filed on approximately December 23, 2006 and Tidal received notice of the Wage Claims sometime around January 9, 2007. Not surprisingly, within days of Tidal's receipt of Goryl's Wage Claim,

Tidal sent a written memo entitled "final warning" to Goryl on January 22, 2007 falsely claiming that his job performance was inadequate and notifying him that he was subject to immediate termination.

56.     Tidal thereafter terminated Goryl on March 12, 2007.

57.     Goryl's actions constitute reasonable and proper attempts to secure and recover unpaid wages and to notify his Tidal superiors of numerous ongoing violations of wage, labor, securities and other laws occurring at Tidal and breaches by Tidal of its own supposed policy of complying with the "letter and the spirit of the law and [] adher[ing] to the highest principles of business ethics." Accordingly, Goryl's actions are protected activities under Texas law, under California law, and under Tidal's Employment Agreement and Goryl may not be subject to any adverse employment actions or retaliatory activities as a result thereof.  Moreover, California law specifically protects an employee from retaliation for filing a wage claim, reporting a wage violation to superiors or seeking to recover wages ostensibly due.

58.     Each of the adverse employment actions taken by Tidal against Goryl, including the failure to pay any wages owed, the negative unfavorable revision of Goryl's compensation plan, the refusal to acknowledge the exercise stock options, the defamation, the heightened scrutiny and selective enforcement of policies, the probation and, ultimately, the termination described above, materially affected the terms and conditions of Goryl's employment and were taken by Defendants in response to and based at least in substantial part upon Goryl engaging in the protected activities described herein.  Accordingly, Tidal's adverse employment actions against Goryl constitute illegal and actionable retaliation under Texas and California laws and under Goryl's Employment Agreement.

59.     Tidal's termination and discharge of Goryl for asserting his protected rights further constitutes a wrongful discharge in violation of his Employment Agreement and California law.

60.     On information and belief, Tidal and Brenton engaged in the retaliatory actions described herein knowingly, intentionally and with malice.

61.     Goryl has been severely damaged by Tidal's wrongful discharge and illegal retaliation against him.  Goryl is entitled to recover his actual damages, including all lost of wages (including back pay and forward pay had the employment relationship not been wrongfully breached by Tidal) and the maximum value of the stock underlying his stock options, mental anguish, damages, and punitive and exemplary damages in an amount reasonable to prevent similar conduct by Defendants in the future, reinstatement, and all costs and reasonable attorneys' fees incurred by Goryl.

<div align="center">

**COUNT V:**
**Breach of Contract – Refusal to Permit the Exercise of Goryl's Unrestricted Stock Options**

</div>

62.     Plaintiffs reallege the above paragraphs.

63.     On December 12, 2006, after having worked for Tidal for over twenty months, Goryl notified Tidal in writing of his exercise of the unrestricted stock options promised to him in his offer of employment and delivered and tendered a check in the amount of $226.12 to Tidal in full payment for the exercise of his stock options to purchase 500 shares of Tidal common stock at $0.40 per share.

64.     At no time prior to Goryl's exercise of these stock options and tender of payment did Tidal provide any other documents or information to Goryl regarding his stock options or imply that there were any other conditions upon the exercise of such stock options beyond the two conditions stated in his offer of employment (*i.e.*, acceptance of employment and payment of

the exercise price). Similarly, throughout the period of his employment, Tidal never provided Labardini with any other documents or information regarding his stock options and never implied that there were any other conditions upon the exercise of such stock options beyond those in his offer of employment. (Accordingly, on information and belief, these options do not fall within the exemptions from registration provided for under Rule 701 of the Securities Act of 1933.)

65.     Rather than honor Goryl's exercise of the stock options and promptly issuing the 500 shares of Tidal common stock as promised, Tidal instead refused. Tidal told Goryl that the stock options had not "vested" and that in order to receive even a portion of the promised stock options, he would first have to execute a number of detailed legal documents that contained numerous restrictions on those stock options and additional conditions that were not included in his original employment offer. Some of those provisions and conditions included acknowledging that the stock options would only fully vest over four years of employment, that unvested or unexercised options would be forfeited 30 days after termination of employment, and that there would be numerous restrictions on the right to sell any stock issued upon exercise of the options.

66.     Goryl again demanded that Tidal honor his stock options and issue the stock as Tidal had previously promised. Tidal again refused, explaining and acknowledging that though it had been lax on stock option paperwork with a number of employees over a several year period and that "you [Goryl], and many others, fell into a gap when follow through on the details of the option grants and their vesting fell through the cracks," Tidal was now attempting to "catch up on all the missed communications of the past years" and needed and desired to issue the options under its "Stock Option Plan" and wished to have all the necessary stock option paperwork filled out under its Stock Option Plan. Goryl explained to Tidal representatives that that was not the

deal that he had been promised, that if Tidal had wished for his options to be subject to any such plan it could have told him sot back when he was hired and that Tidal's own failure to abide by the terms of its own Stock Option Plan or to properly and contemporaneously communicate to employees upon their hiring that Tidal intended any promised stock options to be subject to and conditioned upon the terms of a Stock Option Plan was Tidal's own fault and problem and had no bearing on Goryl's immediate right to receive the stock that he had paid for. Goryl again demanded that Tidal issue the stock to him under the terms promised to him, but Tidal again refused.

67.     By virtue of Tidal's employment offer and Goryl's acceptance and performance thereof, Tidal and the Goryl entered into a contract. Goryl fully performed all contractual obligations necessary to be entitled to the issuance and delivery to him of the shares of Tidal common stock underlying his unrestricted stock options. Tidal, however, has not performed its contractual obligations. Specifically, Tidal has refused to acknowledge Goryl's exercise of and payment for these stock options and refused to issue and deliver the specified 500 shares of Tidal common stock to Goryl.

68.     All conditions precedent have been performed or have occurred as required under Rule 54 of the Texas Rules of Civil Procedure.

69.     Goryl made a written demand on Tidal to issue and deliver the shares of stock, but Tidal refused to comply. The written demand was made more than thirty (30) days before the filing of this suit in compliance with TEX. CIV. PRAC. & REM. CODE § 38.002.

70.     Tidal's non-delivery of the shares of Tidal common stock constitutes a breach of contract. As a result of Tidal's breach, Goryl has incurred incidental and consequential damages

plus costs and expenses, including attorneys' fees, to recover the stock due and/or the maximum value thereof as allowed by law.  At their election, Plaintiffs may also seek rescission and demand reimbursement and payment of the value of their services provided in exchange for such options.

71.      Because Tidal's stock is unique and its value speculative, Plaintiffs also demands specific performance and an order directing Tidal to acknowledge Goryl's exercise of his stock options and to issue and deliver to Goryl the shares of stock that are due.

72.      Goryl retained counsel to recover for Tidal's breaches.  Therefore, Goryl also seek reimbursement for his reasonable attorney's fees under TEX. CIV. PRAC. & REM. CODE §§ 38.001, *et seq.*

### COUNT VI:
### Fraud

73.      Plaintiffs reallege the above paragraphs

74.      Goryl, Labardini and a number of other Tidal employees accepted employment with Tidal and performed their jobs as requested in reliance upon Tidal's promise to promptly pay them the wages and additional wages promised to them under their agreed-upon compensation plans, to abide by the policies set forth in their Employment Agreements and to issue them stock according to the terms of the stock options promised to them when they were hired.  Each of Tidal's promises and representations (as well as its omissions of fact) were material and were made with the intention that the Plaintiffs (and other Tidal employees) act upon such representation and continue to provide employment services to Tidal.

75.      On information and belief, Tidal never intended to pay these additional wages to its employees on the H-P deal as had been promised under the employees' respective compensation plans, never intended to abide by its expressed policies or operate in compliance with the spirit

and the scope of the laws or under the highest business ethical standards and, as reflected above, Tidal never intended to honor the stock options promised to the Plaintiffs (or to a number of other Tidal employees) in the manner and according to the terms under which they were promised.

76.     Additionally, on information and belief, Tidal has cast a false light on its outstanding equity capitalization by improperly and falsely reflecting on its corporate books and records that unrestricted stock options promised to and earned by a number of employees (some of whom are now former employees, including Goryl and Labardini) have either not vested, expired or been cancelled.  On information and belief, these misrepresented unrestricted stock options are currently exercisable and convertible into tens or even hundreds of thousand of shares of Tidal stock, which amounts to a not insignificant portion of the issued and outstanding equity and ownership of Tidal.

77.     On information and belief, Tidal has been specifically aware for some period of time that it promised a significant number of *unrestricted stock options* to a number of employees (quite likely in excess of 20 employees) over the past several years, that it never informed those employee-optionees that such options were subject to any stock option plan and that it never took the appropriate steps to actually issue such options under its formal Stock Option Plan.

78.     Though these unrestricted stock options have no expiration date and no conditions attached to their exercise beyond that employee's acceptance of employment and payment of the specified exercise price, Tidal management has unilaterally and wrongfully treated these unrestricted stock options as if they were incentive stock options granted subject to Tidal's formal Stock Option Plan.  Tidal management has falsely represented such to be the case in Tidal's corporate record books and stock ledgers—where it has improperly reflected that a number of

these unrestricted stock options either have not fully vested or have expired or been cancelled due to termination of the employee-optionee's employment—as well as in its statutory and regulatory filings and in its periodic reports to shareholders and investors.

79.     Consequently, Tidal's corporate records inaccurately reflect significantly fewer stock options outstanding than are presently actually outstanding and falsely reflect that these unrestricted stock options were issued as incentive stock options under Tidal's Stock Option Plan when, in actuality, Tidal management knew that they were not.

80.     Goryl, by raising the issue of his unrestricted stock options with Tidal management, effectively informed Tidal management of the looming issues concerning the unrestricted stock options promised to him and to other Tidal employees and Tidal's corresponding fraudulent and illegal mistreatment of such options in its books, records and statutory and regulatory filings.  On information and belief, several other employees and ex-employees have also previously raised this same issue with Tidal management on several occasions.

81.     Despite such knowledge, Tidal management has apparently done little or nothing to proactively address or resolve this problem and, on information and belief, has instead attempted to conceal the problem from its employee option holders as well as its board of directors, stockholders and venture investors.

82.     On information and belief, Tidal management's concealment of this information is in furtherance of a scheme to intentionally misrepresent Tidal's equity capitalization.  If Tidal were to address this problem and correct its records, the proper recognition of these unrestricted stock options would result in a restatement of Tidal's earnings, negatively impact Tidal's financial

performance, dilute per share earnings and dilute management's ownership position. Moreover, because these unrestricted stock options fall outside of Tidal's Stock Option Plans, Tidal's venture investors would be entitled to demand that additional equity be issued to them under the terms of their investment agreements and preferred stock purchase agreements. Consequently, Tidal management has elected to simply continue to falsely report its equity capitalization and to improperly and falsely represent on its corporate books and records that these unrestricted stock options are incentive stock options under Tidal's Stock Option Plans.

83.     Tidal publicly touts its financial performance, issues numerous press releases on its website promoting its financial performance and distributes periodic financial reports to its shareholders, investors and potential investors. (For example, Tidal has very publicly disclosed the H-P deal and announced its supposedly stellar quarterly and annual revenues on its website at www.tidalsoftware.com/News%20and%20Events/Press%20Releases/Company_News_Q1_FY07 _Results_Final.asp). As a result of Tidal's management's intentional and wrongful actions (including its miscategorization of the unrestricted stock options granted to a number of employees, its manipulation of the reported timing of the H-P deal, and its improper retention of employee-wages payable on the H-P deal), Tidal's financial reports and press releases cast a false light on the true state of Tidal's finances and its actual equity capitalization.

84.     Plaintiffs (and other Tidal employees) have been severely damaged as a proximate result of Defendants' fraudulent activities.

85.     Plaintiffs are entitled to all actual damages that they have suffered as a result of Defendants' fraudulent activities, including all additional wages due to them on the H-P deal as set forth above, all expenses that they have incurred, the maximum value of the stock underlying

their stock options (as well as any diminution in value resulting from Tidal's fraudulent financial reports), and all benefit-of-the-bargain-type damages, including all lost future wages Plaintiffs would have received had Defendants abided by Tidal's stated "ethical business" policies. Because Defendants' conduct was knowing, malicious, outrageous and unethical, Plaintiffs are also entitled to additional exemplary and punitive damages in an amount appropriate to penalize Defendants and deter similar conduct in the future.

<div align="center">

COUNTS VII AND VIII:
**Breach of Fiduciary Duty and Breach of the Duty of Good Faith and Fair Dealing**

</div>

86.     Plaintiffs reallege the above paragraphs.

87.     By virtue of the policies expressed in its Employment Agreements, Tidal has voluntarily imposed a duty of good faith and fair dealing into its relationship with its employees.

88.     Defendants, as custodians of the corporate records of Tidal, are in a position of special trust and confidence with respect to Plaintiffs (and other employee option holders), at least in so far as the proper and accurate maintenance upon Tidal's books and records of Plaintiffs' stock options and as to the disbursement of wages held in trust for its employees. Accordingly, Defendants are in a fiduciary and/or trustee relationship with respect to Plaintiffs and with respect to Plaintiffs' rights to wages, stock options and shares of stock issuable under such stock options.

89.     On information and belief, Defendants have fraudulently reported or altered Tidal's corporate records, securities ledger(s) and/or capitalization table(s) to falsely reflect that Goryl, Labardini and a number of other Tidal employees and ex-employees have no valid or exercisable stock options in Tidal.

90.     On information and belief, Defendants have disseminated such fraudulently altered corporate records, securities ledger(s) and/or capitalization table(s) to investors and prospective

investors in Tidal in an attempt to obtain additional investments in Tidal and have actually obtained such investments on such false information, thereby wrongfully diluting Plaintiffs' equity position and ownership interest in Tidal.

91.     Defendants actions, including those alleged above, constitute breaches of their special relationship and fiduciary duties and of Tidal's duty of good faith and fair dealings to its employees subject the Employment Agreements.

92.     Plaintiffs have sustained actual losses and injuries as a natural and proximate result of Defendants' fiduciary breaches and breaches of the duty of good faith and fair dealing.

93      On information and belief, Defendants' breaches of these duties were intentional, knowing, willful and/or reckless, entitling Plaintiffs to exemplary damages.

94.     Accordingly, Plaintiffs seek all actual and exemplary damages for Defendants' breaches of these fiduciary duties and duties of good faith and fair dealing.

<div align="center">

**Count IX:**
**Conversion**

</div>

95.     Plaintiffs reallege the above paragraphs.

96.     Plaintiffs have the immediate right to possession, ownership and/or title to the 500 shares of Tidal common stock purchased by Goryl, the 500 stock options for Tidal common stock in the name of Labardini and the $56,250 and at least $293,500 in additional wages that was deliverable to Labardini and Goryl by Tidal

97.     Defendants have wrongfully exercised dominion or control over Plaintiffs' additional wages, shares of common stock and stock options to exclusion of, or inconsistent with, Plaintiffs' right of possession.

98.     Plaintiffs have sustained actual losses and injuries as a natural and proximate result

of Defendants' conversion of these additional wages, shares of common stock and stock options.

99.     On information and belief, Defendants' conversion of these additional wages, shares of common stock and stock options was knowing, willful and/or reckless, entitling Plaintiffs to exemplary damages.

100.     Accordingly, Plaintiffs seeks actual and exemplary damages for Defendants' conversion of Plaintiffs' additional wages, shares of common stock and stock options.

## COUNT X:
## Statutory Fraud under Texas Business & Commerce Code § 27.01

101.     Plaintiffs reallege the above paragraphs.

102.     Defendants' actions constitute false representations of a past or existing material fact and/or false promises to do an act concerning stock in a corporation.

103.     Defendants' false representations and promises were made to induce Plaintiffs (and other similarly situated Tidal employees) to provide services to and contract with Tidal.

104.     Defendants' false representations and promises were material.

105.     Plaintiffs relied on Defendants' false representations and promises.

106.     Defendants acted with actual awareness of the falsity and/or objective manifestations indicate that Defendants acted with such actual awareness.

107.     Defendants failed to at any time disclose the falsity of the representations and/or promises to Plaintiffs.

108.     Defendants benefited economically and otherwise from the false representations and/or promises through services and contributions received from Plaintiffs and the fruits of Plaintiffs' efforts on behalf of Tidal.

109.     Accordingly, Defendants' acts constitute statutory fraud and Plaintiffs are entitled

to recover from Defendants their actual and exemplary damages under TEX. BUS. & COM. CODE §

27.01 (c) and (d).

110.    Plaintiffs also seek their attorney's fees, expert witness fees, cost for copies of

depositions and costs of court in this action under TEX. BUS. & COM. CODE § 27.01 (e).

<div align="center">

**COUNT XI:**
**Violations of Art. 581-33 of the Texas Securities Act**

</div>

111.    Plaintiffs reallege the above paragraphs.

112.    Goryl's and Labardini's stock and stock options constitute securities under the

Texas Securities Act (the "Act").

113.    Tidal is a seller and/or issuer of such securities under the Act.

114.    Tidal's actions set forth above constitute a violation of Art. 581-33A(2) of the

Act.

115.    Brenton is a "control person" within the meaning of the Act and Brenton engaged

in his actions alleged above directly and/or indirectly with the intent to deceive and/or defraud.

Accordingly, Brenton is jointly and severally liable with Tidal under Art. 581-33F(1).

116.    Accordingly, Plaintiffs are entitled to and seek their actual damages in connection

with such violations.

<div align="center">

**COUNT XII:**
***Per se* Negligence and Gross Negligence for**
**Violations of Art. 581-29(c) of the Texas Securities Act**

</div>

117.    Fluke realleges the above paragraphs.

118.    Defendants actions with respect to Plaintiffs' stock and stock options concern the

"delivery of" securities and constitute "dealings in any other manner of security or securities"

within the meaning of Art. 581-29(c) of the Act.

<div align="center">

27                      *Plaintiffs' Original Petition*

</div>

119.   Defendants' acts concerning Plaintiffs' stock and stock options constitute an act, fraud or fraudulent practice and/or practice or course of business which operated and continues to operate as a fraud or deceit upon Plaintiffs in violation of the penal provisions of Art. 581-29(c) of the Act.

120.   Defendants have a duty toward Plaintiff to act in a manner consistent with the requirements of the Act.

121.   Defendants acts alleged above constitute a breach of such duty and are *per se* negligent.

122.   Defendants' conduct was willful, knowing and/or reckless, entitling Plaintiffs to exemplary damages.

123.   Plaintiffs have suffered and seek recovery for their actual and exemplary damages for Defendants' negligence and gross negligence.

### Count XIII:
### Common Law and Statutory Libel, Defamation and Slander *Per Se*

124.   Plaintiffs reallege the above paragraphs.

125.   On information and belief, without justification or excuse, Brenton personally and through agents and representatives made false and defamatory statements to third parties, including other Tidal personnel, about Goryl.

126.   Brenton's false and defamatory statements were harmful to Goryl's reputation and character, affect Goryl injuriously in his office, business profession, and/or occupation, and have caused anguish. Accordingly, Goryl is entitled to recover his actual damages and, because Brenton's statements are slanderous *per se*, Goryl is entitled to presumed damages.

128.   On information and belief, Brenton's publication of these false and defamatory

statements was knowing and/or reckless and with actual malice (or disregard for their falsity), entitling Goryl to exemplary damages.

129.    Tidal is subject to vicarious liability for Brenton's false and defamatory statements.

130.    Accordingly, Goryl seeks actual, presumed and exemplary damages for Defendants' defamatory, libelous and slanderous statements.

### COUNT XIV:
### Tortious Interference with Contracts and Business Relations

131.    Plaintiffs reallege the above paragraphs.

132.    On information and belief, Brenton had actual knowledge and/or knowledge of such facts as would lead a reasonable person to be aware of the agreements and employment and business relationships between Tidal and Goryl and Labardini (including employer-employee relationships and contractual stock optionee relationships).

133.    Brenton, through his actions alleged above, willfully, intentionally and without legal justification interfered with such agreements and relations, increasing the burdensomeness of their performance and resulting in a total breach of the agreements and relationships.  On information and belief, Brenton acted willfully and intentionally to serve his own personal interests, including covering up his wrongful acts discussed above and enhancing his ownership position in Tidal equity, at the long-term expense of the corporation.

134.    On information and belief, Brenton acted out of ill will, spite, evil motive or for the purpose of injuring of Plaintiffs.

135.    Plainitffs have suffered actual damages.

136.    Brenon's actions were a direct and proximate cause of the harm suffered by Plaintiffs.

155.   Defendants had actual authority and were in a position of power over Plaintiffs. Plaintiffs suffered severe emotional distress, including stress, embarrassment, grief, humiliation and shame as a result of Defendants' course of conduct surrounding their manipulation of Plaintiffs' compensation plans and wrongful withholding of hundreds of thousands of dollars in wages. Goryl additionally suffered severe emotional distress as a result of Defendant' intentional and outrageous retaliatory course of conduct surrounding his threatened and eventual loss of employment.

156.   Defendants' course of conduct, which was harassing and bordered on criminal activity, was extreme and outrageous.

156.   Plaintiffs have suffered actual damages as a proximate result of Defendants outrageous conduct and are entitled to recover for their mental anguish and for all lost earning capacity that they have suffered.

### COUNT XVIII:
### Negligent Misrepresentation

157.   Plaintiffs reallege the above paragraphs

158.   In the alternative, Tidal and its agents did not exercise reasonable care when communicating with Goryl and Labardini regarding the terms, conditions and benefits of their prospective and/or continued employment with Tidal, including additional wages and stock options that they would receive. As a result, Tidal's agents communicated false information to Plaintiffs regarding the compensation (including additional wages and stock options) that Plaintiffs would receive. These representations were made to Plaintiffs in the course of Tidal's business and in connections with transactions in which Tidal had a pecuniary interest. Tidal and its agents supplied this false information to the Plaintiffs for their guidance and Plaintiffs justifiably relied

a.    An award of all actual, presumed, incidental, special and consequential damages, including both economic and non-economic damages;

b.    An award of all enhanced, exemplary, treble and punitive damages as allowed by law or by contract;

c.    Injunctive relief prohibiting Tidal's further sale or issuance of stock, options or equities prior to the resolution herein of issues relating to Tidal's promises of unrestricted stock options to its employees and former employees;

d.    Imposition of a constructive trust over Tidal's equity securities and operating capital accounts and disgorgement of the proceeds of any profits traceable to the funds constituting the unpaid wages described herein or the sales or transfers of Defendants' equity securities, and restitution of all monies and advantages wrongfully received and held by Defendants;

e.    Specific performance and a declaratory judgment as requested above;

f.    An award to Plaintiffs of their reasonable costs and attorneys' fees;

g.    Prejudgment and post-judgment interest on any damage awards as allowed by law; and

h.    All other relief to which Plaintiffs are entitled or which this Court deems just, proper or appropriate.

### Jury Demand

Under TEX. R. CIV. P. 216 and Texas Government Code § 51.604(a), Plaintiffs respectfully request a jury trial on all issues so triable in this action and tender the appropriate fee.

**Plaintiffs' Requests for Disclosure to Defendants**

Pursuant to Rule 194 of the Texas Rules of Civil Procedure, Plaintiffs respectfully request

that Defendants Tidal Software, Inc. and Flint J. Brenton disclose, within 30 days from the service

of this request, the information or materials described in Rule 194.2(a)-(i).

Respectfully submitted,

Law Offices of Carl F. Schwenker

By:

Carl F. Schwenker
Texas Bar No. 00788374
4526 Speedway
Austin, Texas 78751
Telephone (512) 374-0808
Fax  (512) 857-1294

ATTORNEYS FOR PLAINTIFFS

Exhibit A

## SALES INCENTIVE PLAN
## ATTACHMENT II - COMPENSATION PLAN DETAILS

**Employee**              Raul Labardini

**Title**                 Inside Sales Team Lead - East

**Manager**               Inside Sales Manager - Grant Biggs

**Monthly Base Salary**   $5,333.33

**Quota Year**            July 2005 - June 2006

**Quotas**

| Month | Monthly Quota | Quarterly Quota | Annual Quote | Quarterly Bonus |
|---|---|---|---|---|
| July 2005 | $133,333 | | | |
| August 2005 | $133,333 | | | |
| September 2005 | $133,333 | $400,000 | | $500 |
| October 2005 | $133,333 | | | |
| November 2005 | $133,333 | | | |
| December 2005 | $133,333 | $400,000 | | $500 |
| January 2006 | $133,333 | | | |
| February 2006 | $133,333 | | | |
| March 2006 | $133,333 | $400,000 | | $500 |
| April 2006 | $133,333 | | | |
| May 2006 | $133,333 | | | |
| June 2006 | $133,333 | $400,000 | $1,600,000 | $500 |
| **Total Quarterly Bonus** | | | $ | 2,000 |

**Commission Rates**

| | From... | To... | Rate... | | |
|---|---|---|---|---|---|
| Base Rate - all deals: | $0 | $1,600,000 | 0.50% | $ | 8,000 |
| | $1,600,000 | and over | 0.75% | | |

Cold Call Kicker - Any deal that closes as a result of an ISR cold call will be paid at 2.00%

| | From... | To... | Rate... | | | |
|---|---|---|---|---|---|---|
| Kicker Rate | $0 | and over | 2.000% | $ | 8,000 | 25% of $1.6M |

| | | | | |
|---|---|---|---|---|
| Monthly Quota Bonus | $500 | | $ | 6,000 |

Prospects, and Phone Stats measured against Quota
Quota = 4 Prospects (2 Horizon), and 80 call average per day

| | | | | |
|---|---|---|---|---|
| Quarterly ISR Quota Bonus | $2,500 | | $ | 10,000 |
| Base Salary | | | $ | 40,000 |
| **Total Compensation** | | | **$** | **74,000** |

SPIFF Contests on a Monthly or Quarterly basis may also increase total compensation package.
Monthly Quota Bonus SPIFF - If an ISR brings in 6 prospects in a month, 2 Horizon,
               that ISR would qualify for an additional $150 SPIFF.

Agreed:

_____                    _____
Employee                                   CEO or Chairman


_____                    _____
Dated                                      Dated

Exhibit B

# SALES INCENTIVE PLAN

# ATTACHMENT II - COMPENSATION PLAN DETAILS

__Employee__          Gavin Goryl

__Title__          **West Horizon Sales**

__Manager__          **Regional Vice President/Regional Account Manager**

__Base Salary__          $4,166.67 **per month**

__Quota Year__          **April 2006 to June 2006**

__Quotas__

| Month | TES Quota | Horizon Quota | Quarterly Quota | Annual Quota |
|---|---|---|---|---|
| July 2005 | $0 | $0 | | |
| August 2005 | $0 | $0 | | |
| September 2005 | $0 | $0 | $0 | |
| October 2005 | $0 | $0 | | |
| November 2005 | $0 | $0 | | |
| December 2005 | $0 | $0 | $0 | |
| January 2006 | $0 | $0 | | |
| February 2006 | $0 | $0 | | |
| March 2006 | $0 | $0 | $0 | |
| April 2006 | $0 | $154,167 | | |
| May 2006 | $0 | $154,167 | | |
| June 2006 | $0 | $154,167 | $462,501 | $462,501 |

## Commission Rates

---- **Cumulative Quota Credit**

| | From... | To... | Achieved Rate... | | | |
|---|---|---|---|---|---|---|
| Base Rate: | $0 | $600,000 | 5.0% | $ | 30,000 | commissio |
| | $600,000 | $900,000 | 7.0% | $ | 21,000 | |
| | $900,000 | $1,200,000 | 9.0% | $ | 27,000 | |
| | $1,200,000 | $1,500,000 | 11.0% | $ | 33,000 | |
| | $1,500,000 | $2,400,000 | 12.0% | $ | 108,000 | |

## Other Bonuses:

| | | |
|---|---|---|
| Individual Quota Achievement Bonus ($2,500 Quarterly) | $ | 10,000 |
| Top Sales Person ($5,000 Quarterly) | $ | 20,000 |

| | | |
|---|---|---|
| **Top Sales Person Yearly** | $ | 5,000 |

| | | |
|---|---|---|
| **Base Salary** | $ | 50,000 |
| **Total Compensation** | $ | 304,000 |

Additional Items:

**Agreed:**

_____          _____

**Employee**                                   **VP of Sales/CEO**

_____          _____

**Dated**                                      **Dated**





COUNTY AUDITOR'S FORM/9999A                          OFFICIAL RECEIPT        1 NO 191341
HARRIS COUNTY, TEX·  REV.10/99)

# CHARLES BACARISSE DISTRICT CLERK

ACTION: BREACH OF CONTRACT            CASE: C-200731382      TRANS NO: 7857384     COURT: 11
STYLE PLT: GORYL, GAVIN
DEF: TIDAL SOFTWARE INC

| FEE | DESCRIPTION | QTY | AMOUNT | | | |
|-----|-------------|-----|--------|--|--|--|
| 100 | FILING NEW CASE | 1 | 50.00 | PAYMENT 1 | TX ONLINE - MASTERCA | 480.25 |
| 121 | CITATION WITH 1 COPY | 3 | 24.00 | PAYMENT 2 | | |
| 195 | SECURITY SERVICE FEE | 1 | 5.00 | | | ----------- |
| 198 | DC RECORDS PRESERVAT | 1 | 5.00 | AMOUNT TENDERED: | | 480.25 |
| 199 | RECORD PRESERVATION | 1 | 5.00 | TOTAL AMOUNT: | | 480.25 |
| 298 | SERVICE COPIES | 129 | 32.25 | AMOUNT APPLIED: | | 480.25 |
| 350 | CONSTABLE | 3 | 195.00 | CHANGE: | | .00 |
| 450 | JUDICIAL FILING FEE | 1 | 40.00 | | | |
| 452 | LEGAL SRVC FEE-CIVIL | 1 | 10.00 | RECEIVED  SCHWENKER, CARL FREDERICK | | (00788374) |
| 453 | SUPPORT OF JUDICIARY | 1 | 37.00 | OF       4526 SPEEDWAY | | |
| 475 | LAW LIBRARY | 1 | 15.00 | AUSTIN, TX 78751-0000 | | |
| 500 | JURY FEE (51.604 GOV | 1 | 20.00 | FOUR HUNDRED EIGHTY DOLLARS AND 25/100********************************** DOLLARS |
| 502 | JURY FEE (RULE 216 T | 1 | 10.00 | PAYMENT DATE: 05/22/2007     FILE DATE: 05/22/2007 |
| 525 | STENO FEE | 1 | 15.00 | | | |
| 601 | DISPUTE RESOLUTION F | 1 | 10.00 | | | |
| 775 | APPELLATE JUDICIAL F | 1 | 5.00 | | | |
| 987 | E-FILING CCARD CONVE | 1 | 2.00 | | | |

ASSESSED BY: CHAMBERS, WANDA RENEE
VALIDATED 05/23/2007  BY: BRANTLEY, FURSHILLA

MEMO: ED101J015094521

                                    CUSTOMER COPY

---

COUNTY AUDITOR'S FORM/9999A                          OFFICIAL RECEIPT        1 NO 191341
HARRIS COUNTY, TEXAS (REV.10/99)

# CHARLES BACARISSE DISTRICT CLERK

ACTION: BREACH OF CONTRACT            CASE: C-200731382      TRANS NO: 7857384     COURT: 11
STYLE PLT: GORYL, GAVIN
DEF: TIDAL SOFTWARE INC

| FEE | DESCRIPTION | QTY | AMOUNT | | | |
|-----|-------------|-----|--------|--|--|--|
| 100 | FILING NEW CASE | 1 | 50.00 | PAYMENT 1 | TX ONLINE - MASTERCA | 480.25 |
| 121 | CITATION WITH 1 COPY | 3 | 24.00 | PAYMENT 2 | | |
| 195 | SECURITY SERVICE FEE | 1 | 5.00 | | | ----------- |
| 198 | DC RECORDS PRESERVAT | 1 | 5.00 | AMOUNT TENDERED: | | 480.25 |
| 199 | RECORD PRESERVATION | 1 | 5.00 | TOTAL AMOUNT: | | 480.25 |
| 298 | SERVICE COPIES | 129 | 32.25 | AMOUNT APPLIED: | | 480.25 |
| 350 | CONSTABLE | 3 | 195.00 | CHANGE: | | .00 |
| 450 | JUDICIAL FILING FEE | 1 | 40.00 | | | |
| 452 | LEGAL SRVC FEE-CIVIL | 1 | 10.00 | RECEIVED  SCHWENKER, CARL FREDERICK | | (00788374) |
| 453 | SUPPORT OF JUDICIARY | 1 | 37.00 | OF       4526 SPEEDWAY | | |
| 475 | LAW LIBRARY | 1 | 15.00 | AUSTIN, TX 78751-0000 | | |
| 500 | JURY FEE (51.604 GOV | 1 | 20.00 | FOUR HUNDRED EIGHTY DOLLARS AND 25/100********************************** DOLLARS |
| 502 | JURY FEE (RULE 216 T | 1 | 10.00 | PAYMENT DATE: 05/22/2007     FILE DATE: 05/22/2007 |
| 525 | STENO FEE | 1 | 15.00 | | | |
| 601 | DISPUTE RESOLUTION F | 1 | 10.00 | | | |
| 775 | APPELLATE JUDICIAL F | 1 | 5.00 | | | |
| 987 | E-FILING CCARD CONVE | 1 | 2.00 | | | |

ISSUED

ASSESSED BY: CHAMBERS, WANDA RENEE
VALIDATED 05/23/2007  BY: BRANTLEY, FURSHILLA

MEMO: ED101J015094521

                                    FILE COPY

# Harris District Civil
**ELECTRONIC FILING MANAGER**

**Court Information**

Clerk:                                          **Chambers, Wanda**

**Attorney & Filer Information**

Attorney Name:                                  Schwenker, Carl F
Attorney Email:                                 cfslaw@swbell.net
Bar Number:                                     00788374
Law Firm:                                       Law Offices of Carl F. Schwenker
Address:                                        4526 Speedway
City/State/Zip:                                 Austin, TX 78751
Phone Number:                                   512-374-0808
Fax Number:                                     512-857-1294
Filer Name:                                     Schwenker, Carl F
Filer ID:                                       cfslaw
Filer Email:                                     cfslaw@swbell.net
Filer Type:                                     Attorney

**Filing Information**

Filing Status:                                  Confirmation
Filer Submission Date/Time:                     Tuesday, May 22, 2007 4:52 PM
Trace Number:                                   ED101J015094521
Court Assignment:                               11th District Court
Hearing Date:
Court Type:                                     District
Case/Cause Number:                              200731382
Style/Case Name:                                Gavin Goryl and Raul Labardini v. Tidal Software, Inc. and Flint J. Brenton
Filing Type:                                    Breach of Contract - Civil - BOC
Sealed Document:                                No
Special Instructions:
Comments to the Filer:                          THANK YOU FOR EFILING
Additional Comments:

**Respondents**

Name:                                           Tidal Software, Inc. (attn: Jon Bode, CFO)
Delivery Method:                                Certified Mail Constable
Service Comments:
Address:                                        2100 Geng Road
                                                Suite 210
                                                Palo Alto,  CA 94303

Name:                                           Brenton, Flint J
Delivery Method:                                Certified Mail Constable

Service Comments:

Address:                                    2323 Baker Road

                                            Houston,  TX 77094

Name:                                       Patton, Dean
Delivery Method:                            Certified Mail Constable
Service Comments:
Address:                                    5700 W. Plano
                                            Suite 100
                                            Plano,  TX 75903

| Filing Parties & Attorney of Record | |
| --- | --- |
| Name | Roles |
| Schwenker, Carl F | Filer - Filing Attorney - Plaintiff Counsel |

| Petitioner Attorneys | |
| --- | --- |
| Name | Roles |
| Schwenker, Carl F | Filer - Filing Attorney - Plaintiff Counsel |

| Defense Attorneys |
| --- |
| None Specified |

| Other Parties |
| --- |
| None Specified |

## Payment Information

**Payment Method: Credit Card - MasterCard, Account # ***********0410**

**Filing Fees**

| | |
| --- | --- |
| Harris County eFiling Fee | $2.00 |
| Breach of Contract - Civil - BOC | $197.00 |
| | Filing Fee Total:  $199.00 |

**Misc. Fees**

| | |
| --- | --- |
| Service Copies | $32.25 |
| Number of Copies (3) | |
| Number of Pages (43) | |
| Jury Fee (51.604 Gov Code)-(Rule 216 TRC) | $30.00 |
| Citation with 1 Copy - Please choose Service Copies fee | $24.00 |
| Number of Citations (3) | |